control of the court, and the court is in a position to compel him, at any subsequent stage of the proceedings, to make good his tender, and to surrender to the assignee, before he shall participate in a dividend, and thus the object of the law, to wit, equality in the distribution of the assets, is secured.

In the present case, if the petitioning creditor shall amend his petition, setting forth to the court the judgment obtained and making a surrender of all preference under or by virtue of it, an order of adjudication will be made upon the acts of bankruptcy alleged and confessed. If not so amended, the proceedings do not disclose a provable debt under the act, and the petition must be dismissed with costs.

---

## Case No. 6,883.

### In re HUNT.

[5 N. B. R. 493;[1] 4 Chi. Leg. News, 5; 2 Pac. Law Rep. 146.]

District Court, D. California. Sept. 30, 1871.

BANKRUPTCY—HOMESTEAD.

A bankrupt applied to the court in bankruptcy for an order to the assignee, requiring him to set apart certain real estate as his homestead, and for an injunction restraining a creditor who had recovered a judgment and issued an execution thereon prior to the bankruptcy, from proceeding to sell the property. The application was denied for the reasons that if the property in question be a homestead, the title is unaffected by the bankrupt act [of 1867 (14 Stat. 517)]. If it is not a homestead, the creditor who has a lien to its full value is the only person interested to establish the fact. If it has been wrongfully seized in execution, the bankrupt has the same rights before the state tribunals as any other person whom it is sought to deprive of a lawful homestead.

[Cited in Re Wyllie, Case No. 18,112; Re Everitt, Id. 4,579; Re McKenna, 9 Fed. 36.]

[In bankruptcy. In the matter of C. Hunt.]

HOFFMAN, District Judge. This was an application by the bankrupt for an order to the assignee requiring him to set apart certain real estate as the homestead of the bankrupt, and for an injunction restraining a creditor who had recovered a judgment against the bankrupt, and issued an execution thereon prior to the bankruptcy, from proceeding to sell the property. The register has reported that in his opinion the property in question has been duly declared a homestead and is exempt from forced sale. In this opinion I am inclined to concur, but I see no reason for making the order and issuing the injunction prayed for. If the property be the legally declared homestead of the bankrupt, no title to it passed to the assignee, and it was wholly unaffected by the assignment. The setting it apart by the assignee could therefore convey no additional title. It would only

amount, when approved by the court, to a declaration that this court, as a court of bankruptcy, has no concern with it.

The provisions of general orders in bankruptcy No. 19, requiring the assignee to report to the court the "articles set off to the bankrupt under the fourteenth section of the act, with the estimated value of each article," evidently refer to the "necessary household and kitchen furniture and other articles and necessaries not exceeding $500 in value," which the assignee is, by that section, required to "designate and set apart," and not to real estate held as a homestead, the title to which, as the act expressly declares, does not pass to the assignee and is not "impaired or affected by any of the provisions of the act." Undoubtedly if the assignee were proceeding to sell or to treat as assets property exempted from forced sale, the court, on the application of the bankrupt would restrain him. But in this case the assignee makes no such attempt, nor has he any interest in the question; for the property, if not a homestead, is subject to the judgment lien of a creditor for an amount which would absorb its proceeds. The real contest is between the bankrupt and the judgment creditor, and the application is an attempt to procure from the bankruptcy court a decision of a question which properly belongs to the tribunals of the state, under whose laws the homestead rights were acquired. I think it clear that no such use can or ought to be made of this court. A homestead is not a "necessary article" to be set off by the assignee. The provisions of the nineteenth rule are therefore inapplicable. The assignee makes his[2] claim to the property and if it be a homestead, the title to it is unaffected by the bankrupt act. If it be not a homestead, the creditor who has a lien to its full value is the only person interested to establish the fact. If it has wrongfully been seized in execution, the bankrupt has the same rights before the state tribunals as any person whom it is sought to deprive of a lawful homestead. The application is, therefore, refused, and the temporary injunction dissolved.

---

## Case No. 6,884.

### In re HUNT.

[17 N. B. R. 205;[1] 35 Leg. Int. 71.]

District Court, D. New Jersey. Feb. 5, 1878.

BANKRUPTCY — PROOF OF DEBT — ASCERTAINMENT OF VALUE OF MORTGAGE SECURITY.

After the adjudication, a creditor who held a mortgage for fifteen thousand dollars on the bankrupt's real estate, had it sold at public auction and purchased it himself for one hundred and forty-two dollars and fifty cents. He then proved for the residue of the mortgage as an

---

[1] [Reprinted from 5 N. B. R. 493, by permission.]

[2] [4 Chi. Leg. News, 5, gives "no."]

[1] [Reprinted from 17 N. B. R. 205, by permission.]

unsecured claim at the first meeting of creditors. The register allowed the proof against objections and permitted him to vote for assignee, whereby a majority in value of the creditors was obtained: *Held*, that no such mode of ascertaining the value of mortgage security is recognized by the bankrupt act [of 1867 (14 Stat. 517)]; that the register had no authority to admit the proof and allow the vote against objection; and that the choice of the assignee under such circumstances was irregular.

[In bankruptcy. In the matter of William R. Hunt.]

NIXON, District Judge. At the first meeting of creditors, in the above case, held for the choice of an assignee, before Mr. Register Stratton, at his office, in the city of Camden, on the 28th and 29th days of January, 1878, twenty-nine creditors, proving debts to the amount of forty thousand three hundred and fifty-five dollars and eighty-nine cents, voted for Mr. Lincoln D. Farr, and forty-three, proving debts to the amount of forty-six thousand six hundred and ninety-nine dollars and fifty-five cents, cast their votes for Mr. James Flynn, a majority in number and value being in favor of Mr. Flynn, I am asked to prove and confirm his election. It appears, however, that amongst the proofs of claim offered was one by Andrew M. Moore, for twenty-one thousand eight hundred and fifty-seven dollars and fifty cents, and that objections were duly made by other creditors to his proving or voting, upon the ground that a large portion of his debt was secured, and that he had not surrendered his security before making proof, as required by section 5075 of the act. The register overruled the objections, and allowed the creditor to vote for Mr. Flynn, whereby the requisite majority in value was obtained for him. If his vote was improper, or, under the circumstances, unlawful, then an election by the creditors fails, as the greatest part of the creditors in number is for one candidate, and the greatest part in value for the other. The objection to the proof of claim was this: The creditor held a fourth mortgage upon the real estate of the bankrupt for fifteen thousand dollars. Instead of surrendering it before proof of his debt, he attempted to determine its value by a public sale of the mortgage. He sent it, without the accompanying bond, to M. Thomas & Sons, auctioneers, and caused it to be advertised for sale, at their auction store in the city of Philadelphia, on the 26th of January, 1878. He, of course, became the purchaser, for the net sum of one hundred and forty-two dollars and fifty cents, and reckoning that to be the value of his security, he made a proof of claim for the residue of his mortgage debt, to wit, fourteen thousand eight hundred and fifty-seven dollars and fifty cents, which amount went to make up his whole claim against the bankrupt estate of twenty-one thousand eight hundred and fifty-seven dollars and fifty cents.

These facts appear by the affidavit of the attorney for the excepting creditors sent up by the register with the other papers in the case. It is objected that no such mode of ascertaining the value of a mortgage security is recognized by the bankrupt act, and that the register exceeded his authority when he decided in favor of the validity of the proof of claim and allowed the creditor to vote. Both objections are well taken. The register ought to have said to the proving creditor: "The bankrupt act has provided no machinery for determining the value of your mortgage security, before an election is had of an assignee. If you wish to vote upon the debt, which the mortgage was given to secure, you must here and now surrender the mortgage, and give your lien and stand as an unsecured creditor. If you do not consent to this, I must postpone the proof of your claim until after the election, and allow you to prove and vote only upon that portion for which you hold no security. Your method of determining the value of your mortgage was essentially ex parte, peculiar, and unauthorized by the law at this stage of the proceedings. The forms of sale that you invoked do not change your relations to the bankrupt's estate. You were the purchaser, and you still hold the security, as perfect a lien as it was before the sale took place." Or, if he had taken a different view of the objections raised by the excepting creditors, and had deemed them too trivial to authorize him to postpone the proof of claim, he should have said to the exceptants: "I cannot postpone this proof, because, in my judgment, it is admissible, notwithstanding your objections. But, unless your objections are withdrawn, I shall adjourn the election to a future day, and send the question to the court for decision. I have no power under the law to admit the proof. My power ends with the postponement. All unsecured creditors have the right to vote for an assignee, and believing that this creditor ought to be permitted to cast his vote for the whole amount of his claim—less the sum that the mortgage brought at the sale—I must await the action of the court upon the matters raised by the exception."

I did not suppose it was an open question, that a secured creditor cannot vote for an assignee without first surrendering his security. If authority is needed for such a proposition, see Blum. Bankr. 169; Bump, Bankr. (8th Ed.) 117; In re Davis [Case No. 3,614]; In re Hanna [Id. 6,027]; In re Parkes [Id. 10,754]. And that the power of the register is exhausted when he postpones the proof of claim, and that he cannot admit the claim and allow the vote against objection, see In re Noble [Id. 10,282], and In re Bartusch [Id. 1,086]. In the last case, Judge Lowell, in discussing the power of registers, says: "If debts are objected to, and the register considers them not doubtful, but

clearly valid and admissible, he yet cannot admit them to proof against objection, because that would be the decision of a question which the statute gives him no power to decide." The admission of the proof complained of determined the choice of the assignee. If the creditor had proved for his unsecured debt of seven [thousand] [2] dollars he would have been entitled to vote, but such a reduction of his claim would have given to the opposing candidate the greater part of the creditors in value, and hence defeated the election. For these reasons I cannot approve the choice of Mr. Flynn, but will hear the counsel representing the opposing interests on the question whether a new election should be ordered, or an assignee be appointed by the court.

---

HUNT, In re. See Case No. 5,305.

HUNT (BEDFORD v.). See Case No. 1,217.

HUNT (BLABON v.). See Case No. 1,455.

HUNT v. The CLEMENT. See Case No. 2,880.

---

## Case No. 6,885.

### HUNT v. The CLEVELAND.

[6 McLean, 76; [1] Newb. 221.]

Circuit Court, D. Illinois. Oct. Term, 1853.

COMMON CARRIERS OF GOODS—PROVISION OF BILL OF LADING—NEGLIGENCE—BURDEN OF PROOF—ACCIDENT — NOTE OF PROTEST BY MASTER OF VESSEL.

1. Several casks of hardware were shipped at Ogdensburg for Chicago. The casks were opened and examined at Chicago, and the hardware was found damaged. During the voyage, the propeller encountered a storm, and shipped water and leaked. No positive proof was given as to how the damage was done. The bill of lading promised to deliver the merchandise in good order, the dangers of navigation only excepted. The vessel was tight, staunch and well manned at the time of shipment. The damage being shown, it devolved on the carrier to establish it was within the exception of the bill of lading.

[See Bearse v. Ropes, Case No. 1,192.]

2. He has shown facts from which this can fairly be inferred.

3. The shipper has not proved that the damage could have been avoided by the exercise of reasonable care and skill. The carrier is therefore not liable.

[Cited in Steele v. Townsend, 37 Ala. 247.]

4. It is a useful and proper precaution for a master of a vessel to note a protest at the first port of his arrival, after an accident, but it is not an indispensable duty.

[Appeal from the district court of the United States for the district of Illinois.

[This was a libel by Edwin Hunt against the propeller Cleveland for damages, alleged to have been caused by the negligence of the claimant, to certain goods belonging to the libellant.]

---

[2] [35 Leg. Int. 71, gives "hundred."]
[1] [Reported by Hon. John McLean, Circuit Justice.]

Mr. Stickney, for libellant.
Mr. Waite, for claimant.

DRUMMOND, District Judge. On the 8th of October, 1851, were shipped on the propeller Cleveland, at Ogdensburg, New York, several casks of hardware, for Chicago, belonging to the libellant. On the arrival of the propeller at Chicago, on the 1st of November, when the casks were opened and examined, it was ascertained that the hardware had been wet and damaged to an amount varying from three to five per cent., according to the kind of goods. The libel alleges that this damage was sustained in consequence of the carelessness and unskillfulness of the carrier. The claimants, in their answer, insist that the injury was the result of the dangers of the sea, and was unavoidable. The bill of lading states that the merchandise was shipped in good order and condition, and was to be delivered in like good order and condition—the dangers of navigation only excepted. The sole question in the case is whether the damage was within the exception in the bill of lading. The proof is that the vessel was tight, staunch, well manned and equipped in every respect. The injury being established, it is incumbent on the carrier to show that it was caused by the dangers of navigation, and if it appear it was the consequence of such dangers, then it devolves upon the shipper to make out that the damage might have been avoided by the exercise of reasonable care and skill on the part of the carrier. Clark v. Barnwell, 12 How. [53 U. S.] 272.

Apply these principles to the facts in this case. The casks were stowed in the after part of the forward hold, which was a proper and safe place for that kind of merchandise. The propeller had a cargo of various goods, for Cleveland, Sheboygan, Port Washington, Milwaukee, Racine, Southport and Chicago. Nothing of importance occurred till the 16th of October, when being off Saginaw Bay, the cylinder of one of the engines broke, and other damage was done which compelled the vessel to return to St. Clair to repair. The engine was repaired and they left St. Cloud on the 21st. After leaving St. Clair, and passing Point of Barques, about midnight of that day they were met with a very severe gale from the West. The sea made a clean breach over the vessel, washed things from the promenade deck, stove in the larboard gangway, which caused her to ship a considerable quantity of water which went through the hatch-way into the fire-hold, and to leak. All hands were immediately called and set to pumping. The propeller was put head to the wind and worked up under the lea of the water, and she did not afterwards leak more than usual. The gangway had been well and se-